1                   UNITED STATES DISTRICT COURT

2                       DISTRICT OF MAINE

3      _____

4      UNITED STATES OF AMERICA,              CRIMINAL ACTION

5                  Plaintiff            Docket No:  2:21-00015-JDL-1

6

7           -versus-

8

9      JASON CANDELARIO,

10                   Defendant
       _____
11                      Transcript of Proceedings

12

13     Pursuant to notice, the above-entitled matter came on for
       **Sentencing** held before **THE HONORABLE JON D. LEVY,** United
14     States District Court Judge, in the United States District
       Court, Edward T. Gignoux Courthouse, 156 Federal Street,
15     Portland, Maine, on the 27th day of March 2023 at 9:11 a.m. as
       follows:

16

17     Appearances:

18     For the Government:   Donald E. Clark, Esquire
                             Assistant United States Attorney
19
       For the Defendant:  Edward S. MacColl, Esquire
20
       Also Present:  Heather Belanger, U.S. Probation
21

22
                         Lori D. Dunbar, RMR, CRR
23                       Official Court Reporter

24                   (Prepared from manual stenography and
                        computer aided transcription)
25

```
 1                   (Open court.  Defendant present.)

 2          THE COURT:  Good morning.

 3          MR. CLARK:  Good morning, Your Honor.

 4          THE COURT:  We are convening a hearing in the case

 5   of United States versus Jason Candelario.  This is Docket

 6   21-CR-15.  Counsel, please note your appearances for the

 7   record.

 8          MR. CLARK:  Don Clark for the Government, Your

 9   Honor.

10          THE COURT:  Thank you.

11          MR. MACCOLL:  Good morning, Your Honor, Ed MacColl

12   for Mr. Candelario.  Thank you, sir.

13          THE COURT:  The record will reflect that Probation

14   Officer Heather Belanger is present as well, and of course Mr.

15   Candelario is present in the courtroom.

16      I want to advise counsel and for that matter all

17   assembled that I am recovering from a cold, which has left me

18   with a persistent cough.  I have, however, been testing

19   consistently negative for COVID, but if the cough does get out

20   of control I've brought a mask with me so I will be putting

21   that on.  I want that to be understood by all.

22      Mr. Clark, has the Government provided notice to any

23   victims of this offense who are entitled to notice under the

24   law?

25          MR. CLARK:  Yes, it has, Your Honor.  We have
```

1    provided notice to both victims.  R.S. is in the courtroom.

2    As the Court is aware, on Friday we moved this proceeding up

3    from 10:00 to 9:00 a.m.  We immediately notified both of the

4    victims.  Unfortunately at this point A.M. is not here.

5    Obviously that impacts her ability to attend and be heard, but

6    I think if we start with perhaps the defendant's objection to

7    the PSR, acceptance of responsibility, and the motion for

8    production of all witness statements first, that might get us

9    there to where she'll be here.  I think she'll be here

10    shortly.  Also I think we could take up the restitution

11    portion.

12              THE COURT:  Thank you, Mr. Clark.

13         Mr. Candelario, would you stand, please?  And would you

14    pull the microphone up closer to you?  You are Jason

15    Candelario, correct?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Mr. Candelario, the overall purpose of

18    today's hearing is for me to sentence you based upon your

19    guilty plea and conviction.  I'll be hearing from the lawyers

20    this morning, as well as from you if you wish to speak,

21    although you're not required to, as well as from anyone else

22    that might be presented to speak today.

23         We'll begin with me asking you and your attorney several

24    questions.  The purposes of my questions are, first of all, to

25    make sure you've received and read and fully understand the

1    revised presentence report in this case.  Secondly, I want to

2    be sure there's nothing that interferes with your ability to

3    understand what's taking place in court today.  And overall,

4    third, I want to make sure you understand the sentence that I

5    decide to impose and the reasons for it.

6         Now, if you don't understand a question that I ask you,

7    don't try to answer it.  Just tell me that you don't

8    understand and I'll rephrase the question.  Do you understand?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  And if you wish to speak with

11   Mr. MacColl before responding to a question, let me know that

12   and we'll make arrangements for that to happen.  Do you

13   understand that as well?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Mr. Candelario, are you currently taking

16   any medications?

17             THE DEFENDANT:  No.

18             THE COURT:  Have you had any types of drugs or

19   alcohol or substances in the past 24 hours?

20             THE DEFENDANT:  No, sir.

21             THE COURT:  Are you thinking clearly this morning?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Is there anything at all that might

24   interfere with your ability to hear or understand what's

25   taking place in court this morning?

1              THE DEFENDANT:  No, sir.

2              THE COURT:  Do you authorize Attorney MacColl to act

3     and speak on your behalf throughout this hearing today?

4              THE DEFENDANT:  I do, sir.

5              THE COURT:  Thank you.  You can be seated.

6              THE DEFENDANT:  Thank you.

7              THE COURT:  Counsel, before I proceed further I want

8     to address two matters that were presented by the flurry of

9     last-minute filings submitted by both sides in this case.  At

10    the presentence conference held on February 28th I indicated

11    that I would not determine then whether a resolution of the

12    disputed fact of which of the two defendants, Mr. Candelario

13    or Mr. Carpio, tried to break the passenger window of the

14    truck and shot the handgun, nor could I determine then how

15    that might matter, that determination, in arriving at a fair

16    and just sentence with respect to Mr. Candelario.

17        I have now had the benefit of the various submissions by

18    the Government and the defendant filed since the pretrial

19    conference, and I have of course carefully studied the revised

20    presentence report at length.  Based upon my review and the

21    arguments I've received, it's my conclusion at this juncture,

22    without having received any additional evidence from the

23    parties at this point, the following:

24        One, the facts set forth in the revised presentence

25    report do not establish whether it was Mr. Carpio or Mr.

1    Candelario who tried to break the window and who discharged

2    the handgun.  Secondly, what the revised presentence report

3    does establish is that Mr. Carpio and Mr. Candelario were

4    working together and the actions that each took, wrestling

5    with the victim, R.S., trying to break the truck's window, and

6    then the shooting, were foreseeable consequences of an armed

7    robbery where a victim resists.

8        With the foregoing in mind, based upon the revised

9    presentence report alone, and without considering any evidence

10   the parties might introduce, I conclude that it has not been

11   shown that Mr. Candelario was the individual who tried to

12   break the window and who discharged the handgun.

13       One of the principal sources of information identified

14   in the revised presentence report, paragraph 9, is an

15   individual identified as J.M., who it was later learned was a

16   co-conspirator in the robbery and provided information.

17       The second is an unidentified witness in paragraph 20

18   who the report notes, quote, provided different accounts as to

19   who the shooter was, initially citing that it was Candelario,

20   but then concluded it could have been Carpio, end of quote.

21   Therefore, based solely on these and the other relevant facts

22   contained in the revised presentence report and without

23   considering any evidence that the parties might submit on

24   these points, I would find for purposes of sentencing that Mr.

25   Candelario was, as he claims, the perpetrator who wrestled

1    with the victim, R.S., and that it was Mr. Carpio who tried to

2    break the window and who shot the handgun.

3        Further, based upon again just the presentence report

4    and not any evidence which I have not received yet, for

5    purposes of sentencing today I would also conclude that Mr.

6    Candelario's culpability for the offense conduct is no greater

7    or weaker based upon the conclusion and finding that he

8    wrestled with the victim R.S. and it was Mr. Carpio who tried

9    to break the window and who discharged the handgun.  Both

10   actors, Candelario and Carpio, were working together, and what

11   transpired in the garage was a foreseeable consequence of

12   their joint effort to commit a robbery.  Based upon the

13   information contained in the revised presentence report, I

14   would find that they are equally culpable for what transpired

15   in the garage.

16       Now, if both the Government and the defendant agree with

17   and accept my assessment of the revised presentence report

18   and, therefore, neither wishes to present additional evidence

19   on these issues, then the revised presentence report will be

20   accepted by me as presented, and the relevant paragraphs of

21   the report will be subject to the interpretation and

22   conclusion that I have just announced.

23       Turning to the defendant's motion to compel production

24   of all material statements by any declarant whose statements

25   are offered as evidence, ECF 403, the revised presentence

1    report was provided to the parties in mid-February, more than

2    six weeks ago.  I've carefully considered the defendant's

3    motion.  It does not offer good justification for the

4    defendant's failure to suggest that he needed to engage in

5    additional discovery this late in the proceeding on the eve of

6    sentencing, especially after failing to raise the same at the

7    presentence conference held on February 28th.  But in

8    addition, the motion largely relates to the disputed issue of

9    which defendant, Candelario or Carpio, tried to break the

10   window and discharge the handgun, the factual issue which,

11   based solely on the revised presentence report, I resolve in

12   Mr. Candelario's favor at least at this point.

13        To the extent that the motion relates to other matters

14   unrelated to who broke the window and shot the gun, the motion

15   identifies no fact or facts contained in the revised

16   presentence report, disputed or not, that the request relates

17   to and is therefore nonspecific and vague in failing to assert

18   specific grounds supporting last-minute discovery.

19        Further, I find no due process violation in the

20   Government's unwillingness to produce in response to an e-mail

21   request sent on March 23rd written copies of every witness's

22   written statement in the Government's possession, especially

23   because, as the motion itself acknowledges, the Government was

24   willing to make the statements available to Mr. MacColl to

25   review in person.  Therefore, the motion ECF 403 is denied.

1          So, counsel, at this stage I'm interested to hear from

2     you with respect to what I've just announced and how you think

3     that it -- not how you think but in your view, then, how you

4     wish to proceed with respect to disputed facts associated with

5     the revised presentence report.  Mr. Clark?

6               MR. CLARK:  Your Honor, we do not object to the

7     Court's finding with respect to the first issue and agree with

8     your second determination that's made.  I think I have to

9     defer to my esteemed colleague to determine whether or not

10    there are other paragraphs in the PSR to which he objects in

11    whole or in part.

12              THE COURT:  Thank you.  Attorney MacColl?

13              MR. MACCOLL:  Your Honor --

14              THE COURT:  Why don't you pull the microphone closer

15    to you.  Thank you.

16              MR. MACCOLL:  Certainly, Your Honor, thank you.  The

17    Court's outline is fully acceptable to Mr. Candelario.  He's

18    asked me to emphasize that he isn't blaming anybody else for

19    anything.  He takes full responsibility for everything that

20    happened in the garage, agrees with the Court that he is fully

21    responsible.  He was mistakenly accused of doing things he

22    didn't do.  That's -- that's the basis for his objection.  But

23    it is not the purpose of his -- of our objections to shift the

24    blame to somebody else.  It's simply to have the facts be

25    correctly understood.  And we agree with the Court's

1   assessment, which is I -- essentially I suggested as a

2   possible outcome at the presentence conference, and Mr.

3   Candelario considers that a fully appropriate resolution.  He

4   is a hundred percent responsible and agrees with the Court's

5   assessment in that regard, Your Honor.  Thank you.

6           THE COURT:  All right.  And so that the record is

7   clear, I accept what Mr. MacColl just represented regarding

8   Mr. Candelario's motivation for raising this factual dispute,

9   and I want the record to be clear that I also in no way will

10  hold against Mr. Candelario the fact that he raised what

11  proved to be an accurate objection to the presentence report.

12  And so let's be clear on that.

13       Mr. MacColl, then, where does that leave us with respect

14  to any factual challenges to the information in the report?

15          MR. MACCOLL:  There are, Your Honor, assertions in

16  the report about police reports from other events, including,

17  for example, Mr. Candelario's most recent event that led to a

18  conviction which, as we outlined in the supplemental

19  memorandum we filed fairly late in the day on Friday, the

20  defendants contended in that case was an insurance fraud scam

21  they participated in, and that's not hinted at in the

22  presentence report.  I -- I don't have all of the reports that

23  Officer Belanger was able to gather for that or the other

24  events.  I have very few that I was able to get from Mass --

25  it's a Massachusetts event -- Massachusetts counsel that

1      corroborated how I understood the case got resolved and it

2      came to appear that it was criminal because -- because

3      insurance fraud is a crime.  And it involved entering the

4      house for that purpose.

5              And then the -- the prior convictions also include we

6      think mis -- I'm confident, misleading police reports.  Those

7      reports I have not been allowed to see.  I asked to see them,

8      I haven't seen them, and the Government appears to rely on

9      assertions in police reports concerning dismissed counts to

10     argue for an above-guideline sentence.

11             We object to the assertions in the presentence report.

12     I'm sure if Officer Belanger says she has police reports that

13     include that information, I'm not suggesting Officer

14     Belanger's misrepresenting the police reports.  We

15     respectfully contend that that's not a proper basis for the

16     Government's motion.  We object to those assertions.

17             THE COURT:  Mr. MacColl, you're referring now to the

18     four prior convictions that are the subjects of paragraphs 47

19     through -- one minute -- 46 through 49 of the revised

20     presentence report, correct?

21             MR. MACCOLL:  That's correct, Your Honor, thank you.

22             THE COURT:  And as I understand your objection it is

23     that you're not objecting to the fact of the conviction

24     itself; it's some of the narrative information that is

25     contained relative to each of these convictions; is that

1    right?

2              MR. MACCOLL:  That's correct, Your Honor.  Yes, the

3    conviction -- we agree with the criminal history point

4    assessments.  The convictions are final, binding convictions.

5    Criminal history points have been correctly calculated at 11,

6    the criminal history category is correctly calculated at V,

7    but the narrative includes information I'm sure Officer

8    Belanger believes in good faith based on what she's read.

9    We -- we just dispute it and have not been allowed to look at

10   the underlying documents.

11       They're also just the nature of police reports.  There's

12   descriptions about a person who are a black person or a group

13   of people who did different things, and often a witness

14   doesn't say it was Candelario who did any one of those things

15   because the witness doesn't know Candelario.  So for those

16   reasons, Your Honor, we've objected to those assertions based

17   on the state of the record and our inability to read the

18   underlying documents.

19              THE COURT:  Now, Mr. Clark --

20              MR. MACCOLL:  And because we're convinced that some

21   of them are in fact misleading and mistaken, the alleged

22   victims of this last offense respectfully were -- were in on

23   it.  But -- and we've submitted an outline from the Canton

24   detective's investigation that at least suggests they may be

25   in on it and they refused to cooperate after that came to

1    light.  Thank you, Judge.

2          THE COURT:  Mr. Clark.

3          MR. CLARK:  Your Honor, let me just make two points.

4    One is we don't necessarily disagree with the defense on that

5    limited issue.  The reason the Government put its brief in

6    with respect to the underlying police reports and Department

7    of Corrections records was because at the time it filed its

8    sentencing memo it understood that the defendant had withdrawn

9    the objections to those paragraphs.  And then it -- it

10   resurrected itself.

11         As a result of which -- but having said that, we -- for

12   purposes of his criminal history we asked the Court not to

13   rely on police records or Department of Corrections records

14   that were obtained by the probation officer but not made

15   available to the Government or the defense and that remain

16   objected to by the defense.

17         And I think to be clear on that, because I'm -- I think

18   we do have to make a record here, a robust record for the

19   appeal that my honorable colleague has told me is forthcoming,

20   I think we need to be clear which paragraphs should not be

21   considered by the Court.  And I'm prepared to do that if the

22   Court would like me to walk you through the PSR.

23         THE COURT:  Yes, and before you do that, Attorney

24   Clark, as I understand, you have submitted as proposed

25   exhibits court records that relate to each of these four

1     convictions, correct?

2              MR. CLARK:  I have, Your Honor, and I can offer them

3     into evidence at this point if that would be useful.

4              THE COURT:  And -- in a moment.  And the information

5     contained in the court records is information which I'm

6     assuming the Government wishes for me to consider in assessing

7     each of these convictions and nothing more; is that correct?

8              MR. CLARK:  That's correct, Your Honor.

9              THE COURT:  All right.  Now, if -- Attorney Clark,

10    could you identify for the record which exhibits are the

11    relevant exhibits for purposes of these four convictions?

12             MR. CLARK:  Yes, Your Honor.  They would be marked

13    as Government Exhibits 46, 47, 48, 49, and 51, which have

14    previously been submitted to the Court and to defense counsel.

15             THE COURT:  Mr. MacColl, do you have any

16    objection -- does your client have any objection to the

17    Court's receipt of Exhibits 47 -- 46 through 51?

18             MR. MACCOLL:  To the extent charging documents for

19    dismissed crimes are being offered to prove that the crime

20    occurred, then we do object.  To the extent they're just

21    offered to show that the crime was charged and dismissed, then

22    we don't object, Your Honor.  And obviously with respect to

23    crimes of conviction they are convictions.

24             THE COURT:  Attorney Clark, you're not seeking to

25    have the defendant held responsible for charges which were

 1    dismissed; are you?

 2                MR. CLARK:  No.

 3                MR. MACCOLL:  No objection then, Your Honor.  Thank

 4    you.

 5                THE COURT:  And so, Attorney MacColl, as I

 6    understand your objection, other than that, and we certainly

 7    would not use this information for that purpose, do you have

 8    any objection to the Court's receipt of this evidence?

 9                MR. MACCOLL:  No, Your Honor, thank you.

10                THE COURT:  All right.

11                MR. CLARK:  May I offer these, Your Honor?

12                THE COURT:  Yes, Attorney Clark, please do.  Thank

13    you.

14          Attorney Clark, anything further on these, on this

15    point?

16                MR. CLARK:  Your Honor, just so that we're all

17    clear, I guess I need to understand the defendant's position

18    with respect to paragraphs 43 and 45.

19                MR. MACCOLL:  With respect to 45, Your Honor, Mr.

20    Candelario agrees that he was probably a stubborn and unruly

21    child when he was 12 years old.  That's accurate.  He doesn't

22    doubt that response.

23          We have objected to the assertion in 43 that he is a

24    validated some kind of a rank in a gang.  He thinks that

25    that's not accurate, and we don't know where that came from,

1    Your Honor, paragraph 43.  So paragraph 43 we're objecting,

2    Your Honor.

3           THE COURT:  Okay.  Attorney Clark?

4           MR. CLARK:  I just needed to understand, Your Honor.

5    Given the prior ruling of the Court, we assume the Court will

6    not consider that.

7           THE COURT:  All right.  The Court won't -- I will

8    not consider paragraph 43 of the presentence investigation

9    report.  I will consider paragraph 45.

10          Attorney Clark, at this stage, then, is there any

11   additional evidence that the Government wishes to -- sees the

12   need to introduce with respect to the presentence

13   investigation report?

14          MR. CLARK:  I think we need to understand from the

15   defense what their position is with respect to paragraphs 10,

16   11, 18, 19, and 20.

17          MR. MACCOLL:  So I think I can do this pretty

18   quickly, Your Honor.

19          THE COURT:  Yeah.

20          MR. MACCOLL:  10 includes an assertion that R.S.

21   made a statement about who -- who the glasses that had some --

22   I'm losing my brain, Your Honor -- DNA that belonged to the

23   defendant.  And -- and actually the Government has marked

24   R.S.'s statement which said he doesn't really know.  That's

25   the objection to 10.  So we do object to that assertion in 10.

1          MR. CLARK:  Can we do them one at a time, Your

2    Honor, just so the record is clear?

3          THE COURT:  Yeah.

4          MR. MACCOLL:  That was the issue on 10.

5          MR. CLARK:  And as the Court can see, as a result of

6    the objection that was made by the defendant, there's a

7    parenthetical that follows that in which he says, in his

8    objections the defendant stated that R.S.'s speculation that

9    the glasses found in the garage had been worn by the intruder

10   who discharged the firearm is mistaken; therefore, we asked

11   the Court not to make a finding with respect to that

12   allegation.

13       It is important because the glasses -- the DNA of the

14   defendant was found on the glasses, and he contests being the

15   shooter.  So it would be appropriate for the Court not to make

16   a finding with respect to that one sentence.  But the rest of

17   the paragraph we believe should remain as accurate in the PSR.

18         THE COURT:  Attorney MacColl, do you agree?

19         MR. MACCOLL:  Yes, Your Honor.

20         THE COURT:  All right.  And I so rule.  And that's

21   how I will treat paragraph 10.

22         MR. CLARK:  And with respect to paragraph 11, just

23   as I think I can help my honorable colleague, I think the

24   issue in that paragraph had to do with the other individual

25   appearing to tuck something into his pants, which is the

1    second-to-the-last sentence.

2         THE COURT:  Right.

3         MR. CLARK:  I think the Court need not make any

4    finding with respect to that.  We were prepared to offer in

5    the video evidence which we submitted to the Court, but I

6    think it's immaterial.  We disagree with the defendant on that

7    point, but it's immaterial to the Court's determination.

8         THE COURT:  So you would --

9         MR. CLARK:  Make no finding, Your Honor.

10        THE COURT:  You're proposing, then, that 11

11   essentially be modified by the deletion of the reference --

12   I'm trying to find it now.

13        MR. CLARK:  Second-to-the-last sentence, Your Honor,

14   in 11.

15        THE COURT:  That the other individual appeared to

16   tuck something into his pants, that that sentence be deleted?

17        MR. CLARK:  That's fine, Your Honor.

18        THE COURT:  Attorney MacColl?

19        MR. MACCOLL:  Yes, Your Honor.

20        MR. CLARK:  The next issues, Your Honor, have to

21   do --

22        THE COURT:  I just want the record to be clear that

23   I am ruling that 11 be so modified, that is, the deletion of

24   the penultimate sentence.  I won't consider it.  Next?

25        MR. CLARK:  Your Honor, actually the next objection,

1    I mentioned this earlier, were paragraphs 13 to 15.  We

2    believe they are all -- they are all -- the defense objection

3    was they are irrelevant; we believe they are relevant.  They

4    are part of the relevant conduct of the conspiracy ongoing

5    after the fact.  On that basis we think they should remain in

6    the PSR.

7             THE COURT:  Mr. MacColl?

8             MR. MACCOLL:  Well, I think I said at the conference

9    I'm not asking you to take them out.  I think they're not

10   relevant to sentencing Mr. Candelario, but if the Court feels

11   they are, I suspect that these folks denied their involvement.

12            THE COURT:  Okay.  So as I understand your position,

13   Mr. MacColl, you're not objecting to the Court's consideration

14   of the information, but you're suggesting that I view it as

15   immaterial, irrelevant, to my sentencing of Mr. Candelario?

16            MR. MACCOLL:  Yes, Your Honor.

17            THE COURT:  All right.  We'll treat it as such.

18            MR. CLARK:  Jumping to 18, Your Honor, as I

19   understand the defense objection to paragraph 18, he objected

20   in toto to the paragraph because he objected to the word

21   recruited in the context of the defendant recruiting two

22   others and preferred the word invited two others in the first

23   sentence.  We have no objection to that objection.  He

24   objected to the words immense amounts of marijuana and did not

25   recall the amount being 250 to 500,000 dollars in money or

1   drugs.  He objected to did not like -- I'm sorry, the

2   defendant did not like the statements about selling drugs in

3   jail or permitting a home invasion robbery in Manchester, and

4   on that basis he objected to the whole paragraphs.  And I'm

5   not sure what the current position of the defendant is with

6   respect to those other issues.

7           MR. MACCOLL:  Those were the concerns with the

8   paragraphs, Your Honor, which we object.

9           THE COURT:  And so, Mr. Clark --

10          MR. CLARK:  Your Honor, we have no objection if the

11  Court makes no finding with respect to those issues, as long

12  as the rest of the paragraph remains in.

13          MR. MACCOLL:  That's acceptable, Your Honor.

14          THE COURT:  All right.  I will adopt that position.

15  And as to those items that Mr. Clark just specified, they will

16  not be adopted by the Court and therefore disregarded.

17          MR. CLARK:  With respect to paragraph 19, Your

18  Honor, the defendant objected in toto to, frankly, a paragraph

19  largely about a co-defendant, but mostly because he was

20  concerned about the statement regarding he needed the money in

21  order to flee.  We have no objection if the Court makes no

22  finding with respect to whether or not the defendant needed

23  the money to flee, but we believe the rest of the paragraph

24  should remain in the PSR.

25          MR. MACCOLL:  No objection.

1          THE COURT:  All right.  I will adopt -- one moment.

2          MR. CLARK:  The money to flee is in the first

3    sentence, Your Honor, and the last.

4          THE COURT:  Those statements will -- are stricken,

5    and I will not consider them.

6          MR. CLARK:  Your Honor, with that I believe that

7    concludes the defense's objections to the PSR.  On that basis

8    we will not press our motion to deny him acceptance.

9          THE COURT:  Mr. MacColl?

10          MR. MACCOLL:  That sounds correct, Your Honor.

11    Thank you.

12          THE COURT:  Mr. Clark, let's review, then, the

13    status of your exhibits.  The Court has received those that

14    you've moved beginning with Exhibit 46.  Are there others that

15    you intend to introduce today?

16          MR. CLARK:  There are, Your Honor, having to do with

17    restitution.

18          THE COURT:  All right.  Let's turn to that.

19          MR. CLARK:  Your Honor, with respect to restitution,

20    this is a mandatory restitution case.  Under the MVRA that

21    I'll refer to as the act, a court shall order a defendant who

22    commits a crime of violence or an offense against property

23    under Title 18 to make restitution to the victim of the

24    offense.  Object robbery is unlawfully taking someone's

25    personal property against his will by use of threat or force

1    against his person or property.

2        We believe that under the act the Hobbs Act robbery and

3    conspiracy are crimes of violence or offenses against property

4    under Title 18 and rely on the First Circuit's decision in

5    Garcia-Ortiz, which we briefed, as well as the other cases out

6    of the circuit finding that when the object of a conspiracy is

7    a property offense it falls within the definition of -- within

8    the act for mandatory restitution.  In this case the victim is

9    defined as a person directly and proximately harmed by the

10   defendant, so we believe that R.S. is entitled to full

11   restitution.

12       The defendant has made an argument that because we

13   dismissed Counts 3 and 4, alleging 924(c) liability, that --

14   that this is not a case for mandatory restitution under the

15   violence clause.  We disagree with that.  The decision to

16   dismiss Counts 3 and 4 arose out of a policy decision by the

17   Department of Justice.  The law of this circuit is that under

18   the act a Hobbs Act robbery is a crime of violence.  Even if

19   it isn't, it's a crime against property.

20       At this time the Government offers Government Exhibits

21   1, 2, 3, 5, 6, 7, 8 and 9.

22              THE COURT:  1, 2, 3, 5, 6, 7, 8, and 9, correct?

23              MR. CLARK:  Correct, Your Honor.

24              THE COURT:  Thank you.  Mr. MacColl?

25              MR. MACCOLL:  Your Honor, we think the Government is

1    mistaken with respect to the crime of violence issue for the

2    reasons that we briefed.  We think the issue is not material

3    because an alternative basis for restitution is that a victim

4    was -- suffered physical injury as a result of a crime.  And

5    that's undisputed.  And Mr. Candelario agrees he should pay

6    restitution, so the Court can address the legal issue or not.

7    But we agree that this is a restitution case and that the

8    homeowner's entitled to restitution.

9        We have objected, Your Honor, to Government's Exhibit 3,

10    and I'm confused by the exhibit.  I'm informed by the

11    Government that the homeowner attempted to -- to obtain from

12    the hospital his bills.  And he -- and he provided the Court

13    in his declaration with the number of bills that he's

14    apparently ever seen.  I'm told by the Government that the

15    Government subpoenaed these records relatively recently,

16    Exhibit 3, and have provided them to the Court.

17        I'm not a medical doctor, but I reviewed them.  And

18    there's a bizarre system in our country for how hospitals keep

19    records about what the charges are at different levels that do

20    or don't go to Medicare, Medicaid, insurance companies, or

21    patients.  The best of my information is the homeowner's never

22    received this bill, have submitted a declaration that I got

23    over the weekend, got yesterday from a physician concerning

24    the charges that seem most obviously bogus to me, which was

25    1,250 bucks plus or minus, 65 dollars, I think, for

1   acetaminophen, which, if administered, 300 grams of

2   acetaminophen in two days, my physician friends have told me

3   is probably lethal, definitely malpractice, and would never

4   happen.  I looked online and acetaminophen -- 300 grams of

5   acetaminophen at Walmart costs 3.48 for a hundred grams, so

6   $10.50.  And the hospital has created some record of $1,200.

7       I received this relatively recently; it doesn't make any

8   sense to me.  The homeowner's never received this bill.

9   Something is wrong here.  We have an odd system for how

10  hospitals keep track of what they are or aren't charging or

11  claim are charges.  There's a declaration from a woman named

12  Tiffany Jackson in Virginia about what are fair and reasonable

13  charges in New Hampshire.  And I just know from looking at it

14  in the little bit of time I had these charges aren't fair and

15  reasonable, and my sense is they're not real and that's the

16  basis for the objection, Your Honor.

17      Obviously if -- if the victims bring a civil lawsuit

18  against the defendants, plus or minus the other participant,

19  they're going to recover a lot more than the Government's

20  suggesting they should recover.  I mean, this is serious,

21  serious personal injury and a real matter, but this isn't a

22  civil action.  This is a restitution case, and the Government

23  is asking for recovery for amounts that apparently have never

24  actually been billed and can't be real.  Thank you, Judge.

25          THE COURT:  Attorney Clark, anything else?

1          MR. CLARK:  No, Your Honor, just briefly.  We

2    believe that the acetaminophen prescription was probably

3    intravenous.  It's much more expensive.  We have no basis to

4    dispute what we received from the hospital as its bill.

5          We note that the act specifically requires that when a

6    victim suffers bodily injury a court must order the defendant

7    to pay an amount equal to the cost of necessary medical care.

8    We also -- and that necessary medical care, according to the

9    hospital, was $158,311.06.  We cited U.S. v. Johnson out of

10   the Fourth Circuit because that Court considered whether or

11   not there should be a reduction depending on whether or not

12   the bill had been paid or remained outstanding.  We submit to

13   the Court that the Mandatory Victims Rights Act or the act

14   itself requires the Court to increase the restitution by the

15   amount of the necessary medical care, and we believe the best

16   evidence of that is what's been submitted to the Court as

17   Government Exhibit 3.

18          THE COURT:  Thank you.

19          MR. CLARK:  And if I might add, Your Honor, I don't

20   believe there was any objection to the $11,966 to stay in

21   hotels after the shooting as reflected in Government Exhibit 5

22   because the defendant was afraid to go home as a result of the

23   shooting.  And I think there is no objection to --

24                    (Counsel conferred.)

25          MR. CLARK:  I'm sorry, the victim was afraid to go

1    home as a result of the crime -- thanks, counsel -- and

2    according to Government Exhibit 1 he lost 10,000 in wages for

3    a month after he was shot while he was ambulating in a

4    wheelchair.

5            THE COURT:  All right.  So, Attorney Clark, you have

6    at this point moved the admission of 1, 2, 3, 5, 6, 7, 8, and

7    9; is that correct?

8            MR. CLARK:  That's correct, Your Honor.  I would ask

9    that 3 be sealed, given that it refers to confidential medical

10   procedures.

11           THE COURT:  Is there any objection?

12           MR. MACCOLL:  No objection to sealing, Your Honor.

13   I assert my objections to Exhibit 3 otherwise.

14           THE COURT:  1, 2, 3, 5, 6, 7, 8, 9 are admitted; 3

15   is ordered received under seal.

16      Based upon my review of the exhibits, the memoranda

17   filed by the parties, and my examination of this question, I

18   conclude, first of all, that this is a mandatory restitution

19   case in keeping with Title 18 Section 3663A(b)(4), among other

20   relevant provisions.

21      With respect to the amount of restitution in this case,

22   I think that the defendant raises a good question, why is it

23   that acetaminophen is so expensive, and has submitted a

24   declaration from a medical doctor raising that very question.

25   Nonetheless, this was an eight -- by my calculation a -- eight

1    days in the hospital, including surgery.  It is general

2    experience to know that hospitals do charge quite a bit for

3    medications and even those that might be available on an

4    over-the-counter basis.  And that one charge alone I don't

5    find to be sufficiently of concern to somehow call into

6    question the reliability of the information as a whole as to

7    what this hospitalization would have cost.

8         The exhibits themselves are competent evidence of

9    expenses incurred by the victim in this case for purposes of

10   this determination and I accept them.  For that reason I am

11   going to order restitution in this case of a total amount of

12   $180,277.06.  That will be without interest and it will be

13   joint and several.

14        Attorney Clark, is there any additional evidence that

15   the Government seeks to introduce?

16             MR. CLARK:  Not at this time, Your Honor.  And, Your

17   Honor, just so that I'm clear, were 46 through 51 admitted?

18             THE COURT:  Yes, they were.

19             MR. CLARK:  Thank you, Your Honor.

20             THE COURT:  Mr. MacColl, any additional evidence

21   that the defendant at this time would seek to introduce or any

22   other objections to the revised presentence report I need to

23   consider?

24             MR. MACCOLL:  Your Honor, we have attached to our

25   sentencing memorandum, I think it's Exhibits 1 through 11.

 1    And we added the declaration the Court's made reference to

 2    from a physician, which is our Exhibit 12.  I would offer 1

 3    through 12, Your Honor.  I have marked copies for the Court.

 4              THE COURT:  All right.  Attorney Clark?

 5              MR. CLARK:  Without objection.

 6              THE COURT:  All right.  Defendant's Exhibits 1

 7    through 12, copies of which I've received in advance, are all

 8    admitted.

 9         Attorney MacColl, anything further?

10              MR. MACCOLL:  Your Honor, with respect to issues

11    raised by the -- in the presentence report, there isn't.

12         There are seven relatives or friends of Mr. Candelario

13    present.  At least a couple of them would appreciate the

14    opportunity to address the Court.  I assume the Government

15    wishes to address the Court on sentencing, as does the

16    defendant and his attorney.

17              THE COURT:  Very good, thank you.

18              MR. CLARK:  There's also one victim who would like

19    to speak, Your Honor.

20              THE COURT:  All right, thank you.

21         Mr. Candelario, if you'll stand again, please.  So, Mr.

22    Candelario, we've -- the attorneys and I have just talked

23    through various objections to the report, many of which I have

24    upheld.  Apart from all that we have just addressed in terms

25    of information in the report that you object to and which I

```
1    have now ruled upon, putting all that aside -- first of all,
2    you've read the report; is that correct?
3              THE DEFENDANT:  I have.
4              THE COURT:  Do you feel that you understand it?
5              THE DEFENDANT:  I do.
6              THE COURT:  Have you had sufficient time to discuss
7    it with your lawyer?
8              THE DEFENDANT:  I have, Your Honor.
9              THE COURT:  Is there any other information in the
10   report that you object to that we haven't addressed?
11             THE DEFENDANT:  No, Your Honor.
12             THE COURT:  So the information to your personal
13   knowledge is true; is that correct?
14             THE DEFENDANT:  Yes, Your Honor.
15             THE COURT:  Thank you, you can be seated.
16        Attorney Clark, you've indicated that there's a victim
17   of the offense that wishes to address the Court at this time;
18   is that correct?
19             MR. CLARK:  Yes, Your Honor.
20             THE COURT:  Would you please present him or her?
21             MR. CLARK:  A.M., Your Honor, and if we can get a
22   mic, perhaps?
23             THE COURT:  Yes.  Good morning.  I take it that you
24   are the individual identified as A.M. in various court papers?
25             A.M.:  I am.
```

1          THE COURT:  Please proceed.  Would you hold the

2    microphone close to you?  Thank you.

3          A.M.:  You already have my original statement on

4    file.  There's just been a few things that I wanted to add.

5          THE COURT:  One moment, please.  I think we really

6    have to ask you to hold that mic very close because we're

7    having trouble hearing you.

8          A.M.:  So there's a few things that I wanted to add

9    since these sentencings.

10          THE COURT:  Please.

11          A.M.:  People keep saying that it's almost over and

12    it's not.  For me it's getting worse, for my children it's

13    getting worse.  The last time I had to bring my son to -- I

14    caught him sleeping with a knife now, and typically I would be

15    upset about that but I was relieved that he has something to

16    protect himself.

17          THE COURT:  One moment.  We're going to give you a

18    different microphone.

19          A.M.:  I continuously need to remind my kids that

20    the way I react to things and the way that we're living right

21    now isn't normal.  And I just hope that when they are older

22    they don't have to recover from this but I think that we're

23    all going to together.

24        I'm pretty sure all of the people involved had children,

25    as far as I know.  All I've heard is excuses as to why these

1    people feel validated for what they did.  Shitty childhoods,

2    incestual rape as a child, no friends, going to prison, being

3    a junkie.  Now look how many more children are going to have

4    to grow up affected because of their gross, selfish actions.

5        All of their kids are going to grow up without dads.  I

6    have heard half of them are growing up without mothers as

7    well.  I can just hope that you can save their children

8    because they're better off without them based off their

9    actions, and everyone else's children.

10       They didn't care if our kids were home that night.  I'm

11   pretty sure they didn't know.  Between the two of us we have

12   four children that have been very affected by this.  Taking

13   myself out of the equation, four children and I don't know how

14   many children that they have, but that's a lot of kids

15   affected.  It's a lot of kids that can grow up and say because

16   of my shitty childhood I'm going to commit crimes.  And that's

17   not fair.

18       Not only are these hearings a total inconvenience with

19   the last-minute changes on every single one of them or snow

20   days, but it gives me extreme anxiety leading up to and

21   following, almost debilitating where I have to take out of

22   work.  I was really hoping it would get easier and I would get

23   closure but it is not happening, it's not even close.  When

24   this man decided to -- I'll scrap that.

25       I almost feel like speaking today makes me more of a

 1    target and that comment was exactly why, but I think that I

 2    need to be heard.

 3              THE COURT:  Was there a comment made?

 4              A.M.:  There was.

 5              THE COURT:  I didn't hear.

 6              A.M.:  Someone in the back said that was smart that

 7    I --

 8              THE COURT:  I want to remind everyone present that

 9    no one is to speak.  If anyone is to speak there will be

10    consequences.  And I would ask that the marshal pay particular

11    attention to what's going on in the gallery at this time,

12    please.  Go ahead.

13              A.M.:  I think that's it.

14              THE COURT:  Thank you.

15         Attorney Clark, I'll hear from the Government on the

16    matter of sentence.

17              MR. CLARK:  Thank you, Your Honor.  The defendant is

18    before the Court today for sentencing for conspiring to commit

19    Hobbs Act robbery, committing Hobbs Act robbery, and being a

20    felon in possession of firearms and ammunition.

21         This was a horrific and violent crime.  Shortly after

22    midnight on August 3rd, 2019, the defendant and three other

23    men conspired to take from R.S. marijuana and marijuana

24    proceeds against his will by using force, violence, and fear

25    of injury.  That conspiracy resulted in a violent assault and

1  shooting of R.S. and the terrorizing of his girlfriend A.M.

2  The assault was premeditated; it was all part of the plan.

3      The defendant is a 34-year-old, four-time-convicted

4  felon who was one of the two assailants who actually

5  brandished and discharged firearms during the commission of

6  this violent felony.  The use of guns and violence was

7  foreseeable to the defendant, as the Court has already ruled.

8  He had a gun because it was all part of the plan.

9      Fairly assessed, compared to his three co-defendants the

10 defendant is one of the more culpable, as he concedes he

11 attacked R.S. and tried to choke him out.  This is a serious

12 crime.  The defendant has a 50-year statutory maximum.  His

13 crimes merit a significant jail sentence.

14      The violence used here also warrants a significant

15 sentence to communicate a clear message to the defendant and

16 others similarly situated that our society has laws that must

17 be followed.  To be sure, we cannot describe the horrific

18 nature of this crime to the Court with any more power or

19 impact than has already been done by the victims in this case,

20 by their victim impact statements and other statements.  Their

21 horrific pain, their fear, the suffering that they have been

22 forced to endure is heart wrenching.

23      In terms of the seriousness of the offense, crime

24 doesn't get any more serious than this.  Middle of the night,

25 unprovoked, surprise, violent assault and shooting.  As

1    reflected in Government's Exhibits 6, 7, and 8, R.S. was shot

2    in the abdomen and survived after having lifesaving emergency

3    surgery, and he now lives with permanent disfigurement and

4    scarring.  As reflected in their victim impact statements,

5    R.S. and A.M. are wounded for life, physically or emotionally

6    or both.  All for what?  In a word, money.  This case reflects

7    depraved indifference to human life, all for money.

8            And one thing that makes this case even more troubling

9    is the defendant's criminal history.  This was not his first

10   involvement with the criminal justice system.  Far from it.

11   He has four prior felony convictions, one of which is

12   unscored.  He has convictions for robbery, burglary, resisting

13   arrest, and breaking and entering in the nighttime to commit a

14   felony.  Given his age, this defendant's criminal history is

15   overwhelming.

16           Whatever message the state court system has been trying

17   to send to this defendant, that message isn't working.  He

18   either hasn't heard the message or he heard it and he's not

19   heeding it.  What's clear is that he's not getting it and that

20   that needs to stop.

21           The sentence imposed by the Court today, as the Court is

22   aware, needs to promote respect for the law, provide just

23   punishment for the offense, afford adequate deterrence to

24   criminal conduct, and protect the public from further crimes

25   by this defendant.  The probation officer has identified the

1    following bases as potential grounds for an upward departure

2    or variance:

3        Guideline Section 5K2.0(a)(1)(A), aggravating

4    circumstances because the offense involved two victims, two

5    firearms were used to commit the offense.  The plan included

6    the use of zip ties to restrain the victim and also included a

7    plan to beat him to gain access to his warehouse where the

8    marijuana was stored.

9        The probation officer has also identified guideline

10   Section 5K2.2, physical injury, because of R.S.'s suffering

11   from being assaulted and shot and suffering permanent injury.

12       Probation officer has also identified Section 5H2.3,

13   extreme psychological injury, based upon the victim impact

14   statements of R.S. and A.M.

15       And finally the probation officer has identified

16   guideline Section 4A1.3, based upon criminal history

17   inadequacy.  The Government notes that the revised PSR is

18   erroneous in saying that the defendant's criminal history

19   category is VI.  He's actually V, given that his first adult

20   conviction aged out as reflected in the revised PSR.

21       The Government concurs that physical injury,

22   psychological injury warrant an upward departure or variance.

23   There is no doubt that R.S. suffered a permanent,

24   life-threatening physical injury and that, as reflected in

25   their victim impact statements, both he and A.M. suffered

1    extreme psychological injury.

2         As set forth in the Government's sentencing memorandum,

3    we recommend that the Court depart or vary its sentence upward

4    by at least one criminal history category from V to VI for his

5    understated criminal history and his risk of recidivism and

6    sentence him at the top of the applicable guideline range.

7    The Government submits that that sentence would be fair and

8    reasonable and would comport with the statutory sentencing

9    objectives.

10        We also respectfully ask the Court to untether its

11   sentence from the guideline calculations and indicate that it

12   would impose the same sentence if it decided differently any

13   of the guideline findings that the Court has made today.

14   Thank you.

15        THE COURT:  Thank you, Attorney Clark.

16        Attorney MacColl.

17        MR. MACCOLL:  Your Honor, there were some family and

18   friends of Mr. Candelario who wish to address the Court.

19   Would the Court like to hear from me first?

20        THE COURT:  Whatever you prefer.

21        MR. MACCOLL:  I'll go ahead, Your Honor, and then

22   allow the others to speak, Your Honor.

23        I've represented Jason since this case began in early

24   2021.  And we're here to sentence him today for events that

25   happened in 2019.  I didn't know Jason back in 2019 to 2021.

1    I've known him since then.  I know that in -- for the year and

2    a half before I represented him he was doing time on a

3    pretrial basis for the -- what I think the Government agreed

4    today was a bizarre insurance scam that involved a home

5    invasion, and he got charged with a series of crimes that he

6    hadn't committed, and ultimately it was decided that he hadn't

7    committed them and he got time served.

8         I think to Jason's credit he's not angry about that.

9    And I think he spent that year and a half doing some

10   reflecting and some soul searching about how it is that a

11   remarkably intelligent, empathetic, thoughtful, generous,

12   caring person is also capable, more than occasionally, of

13   incredibly dangerous, mean-spirited, potentially fatal

14   misconduct.  And I've been remarkably impressed by his ability

15   to discuss those issues, to dig deep inside himself, to truly

16   accept responsibility.

17        Here we have a defendant, Your Honor, who was accused by

18   a different participant of doing things he didn't do.  He's

19   asked me to try to straighten that out while simultaneously

20   saying, well, I know I am responsible for them, even though

21   I'm not the one who did it and the person who did do it is

22   lying saying it was me.  That's true acceptance of

23   responsibility at a deep level.

24        The Court I'm confident has read the letters and the

25   presentence report describing Jason's background and the scars

1    that did cause deep wounds in him.  Having a mother who at age

2    nine months went to prison associated with a death, was in

3    prison until he was 16, having no father, being raised in an

4    environment where the -- the rules and the expectations were

5    different.  Even at a young age -- Mr. Harris is here,

6    Ms. Lord, now I think vice president at West High in

7    Manchester, is here.  As a kid he made that kind of impression

8    on those education officials that this is -- this is a special

9    kid but a kid who's lost and needs our help and guidance.

10         He's made real progress over the last now four years of

11    being inside.  And -- and I can see it and I can -- I mean,

12    I -- I offered this to the Government, especially Assistant

13    U.S. Attorney Conley, sit down and talk to him.  He will make

14    a remarkable impression on you and he is genuinely remorseful.

15    I mean, there's nothing I would say to diminish the pain, I'm

16    going to call them the homeowner and his partner because I --

17    I think they want their anonymity and they're entitled to it.

18    But I don't know how I would feel if these things happened to

19    me.  I have a good idea how I would feel if they happened to

20    either of my kids, and there would be no bounds to rage.  You

21    could not contain me if somebody did this to my children.

22         Jason understands that and has thought through

23    understanding it and trying to understand how he did it and

24    how he has done it over a period of time, given his qualities.

25    He knows he's looking at more time, substantially more time,

1    in prison.  He knows that other people are going to be hurt

2    because he's going to be away and that it won't do any good

3    and that it will be his fault.

4         He would like to be recommended for the RDAP program.

5    He obviously has some problems with appears to be -- that they

6    stop at pot, but he's been unable to control that when he's

7    been out.  And any mental health treatment he can get and he

8    needs it.

9              THE COURT:  Attorney MacColl, I actually did not

10   hear you when you just referred to what he could not stop.

11             MR. MACCOLL:  The 500-hour program?

12             THE COURT:  Yeah, and please restate your support

13   for that.

14             MR. MACCOLL:  That he obviously has been unable to

15   control his desire to use marijuana.  He doesn't have a

16   history of addiction to stronger drugs.  But he has had

17   violation issues inside and outside of detention turning to

18   marijuana.  And he needs mental health assistance.  He's

19   smart, he's articulate.  But at some level that -- that can

20   cover up and shield.  I have a lot of -- the Court gave

21   straight probation to a client of mine who died of an overdose

22   six months later because these problems are very difficult to

23   address.  And Jason needs help addressing them and getting to

24   the bottom of them, because that's important to make sure that

25   he lives the life he can lead and that there aren't any more

1    homeowners or their partners who are ever victims again.

2        So -- so that's my plea, Your Honor.  I respectfully,

3    for the reasons outlined in the brief that I submitted and

4    from my close involvement with Jason, who's extraordinarily

5    grateful for the legal assistance -- the Court may recall for

6    the better part of I think it was -- got close to a year I

7    never saw him face to face because of COVID.  He's been

8    incarcerated throughout COVID.  Now there's some visitation

9    but for quite a long period of time, even with his lawyer

10   there was no visitation.  So this has been a lot of difficult

11   time he's spent in custody.  But I've been just remarkably

12   impressed with Jason.  I -- I know that it's genuine because I

13   deal with him on a regular basis.  I tried to get down to

14   Strafford as much as I could and speak to him on the phone

15   regularly.

16       My recommendation, Your Honor, is 120 months.  I can't

17   imagine a sentence of more than 10 years doing any good.  You

18   know, I recognize the Court obviously has to take a variety of

19   considerations into account, and that crown doesn't weigh my

20   head.  But we respectfully submit that 120-month sentence,

21   very substantial sentence, would not in any way send a message

22   that this isn't very, very serious misconduct.  And no matter

23   how much progress you've made in the four years since you

24   committed this serious misconduct you have to pay a price, and

25   Jason knows that and understands it.

1          I know that Kelly Stanley wishes to address the Court.

2     It might be that Mr. Harris does and maybe one or two others,

3     Your Honor.

4          THE COURT:  All right.  Thank you.  Before we hear

5     from those individuals, we're going to take a brief recess,

6     give everyone a chance to stand and stretch if they wish, use

7     the restroom if necessary.  So we'll be in recess for 10

8     minutes until 10:30.

9          MR. MACCOLL:  Thank you, Judge.

10     (A recess was taken from 10:17 a.m. to 10:29 a.m.)

11          THE COURT:  Attorney MacColl, please present the

12     first speaker.

13          MR. MACCOLL:  Your Honor, Mr. Harris will address

14     the Court.

15          THE COURT:  Sir, if you'll approach the microphone,

16     please.  Stand in front of the podium.  No, the other side,

17     there you go, facing me.  If you'll please state your first

18     and last name and spell your last name.

19          MR. HARRIS:  My name is James Harris, it's

20     spelled -- last name is spelled H-A-R-R-I-S.

21          THE COURT:  Thank you, Mr. Harris.  Please go ahead.

22          MR. HARRIS:  Thank you for hearing me.  I was

23     Jason's special education teacher approximately 24 years ago

24     in Manchester, New Hampshire.  Jason was in my classroom,

25     which was a classroom for children with specific emotional

1    disabilities.  He had been diagnosed by a psychologist to have

2    mental health issues, and he had been I believe in special ed

3    programs since his elementary years prior to coming to me.

4         Myself and Miss Gordon, the beautiful blonde lady back

5    there, were coworkers in a classroom.  I'm sorry.  We were

6    coworkers in a classroom and got to know Jason -- got to know

7    Jason very well.  And upon a file review we found that there

8    were serious social and emotional issues going on not only in

9    a classroom situation but at home.

10        Part of the reason I'm so upset, we had the ability to

11   place kids in more professional settings outside of the

12   classroom.  And through IDEA laws there was a process where

13   you would have meetings and you can ask for placements, ask

14   for special resources or services to help the children with

15   special needs, with extenuating special needs.  And as you

16   might have figured, when we approached the district about

17   helping Jason, they decided that they didn't have the funds to

18   do so.

19        So, despite that, myself and my coworkers did the best

20   we could to help him out.  He was -- he was a wonderful young

21   man.  He had some issues, he would leave class once in a while

22   because he was disruptive, whatever.  But he was a caring,

23   very athletic, engaging personality.  And he stayed with us

24   for three years and he basically made some improvements.  He

25   did well; he went on to high school.

1        He did have some other issues outside of school,

2   particularly due to his -- what we felt were attachment issues

3   because he had no father, no mother, and no nurturing person

4   in his life.  And I suspect some anger issues resulted because

5   of that and affect his decision making.  Not saying that's an

6   excuse for what he did, what he continued to do, but there's a

7   side of Jason that is very -- that is wonderful.

8        Outside of school he went on bike rides with us.  He

9   did -- he attended school functions.  He related well to

10  people; he related well to adults.  He was a loving, caring,

11  empathic personality.  And that's the type of personality we

12  want to see him come out of this experience.  I guess I'm

13  hoping to mitigate some of the time that he would be

14  incarcerated for, and I apologize and I think I -- I feel like

15  I own part of the failure of his personality for doing what he

16  did to the family in the back.  But the system failed him.  It

17  failed him dramatically.

18       He -- he went -- he was incarcerated in a youth

19  development center during high school.  And the center right

20  now is being closed down.  There's a -- there's a civil case,

21  a class action suit, because there was a huge amount of abuse

22  and sexual molestation by children at the center.  It's like

23  every chance society had to address his issues and do things

24  for him, it failed.  Just -- just seemed to fail.

25       I've followed him through middle school, high school,

```
 1    and his issues with the court system, and I feel he is ready

 2    to make a change.  I think with the appropriate mental health

 3    care, which I think for the first time he's admitted he needs,

 4    I said to him before, you need mental health -- you need to

 5    have your mental health addressed, and he swore he was fine.

 6    But for the first time he's acknowledging that that's an issue

 7    he needs to have addressed.  And I would hope that the Court

 8    would find that if he got help while he's incarcerated that he

 9    would be rehabilitated and he wouldn't commit these crimes.

10    And he would probably be a great person to talk to other

11    children about some of the things that he's done and

12    experiences he's had and maybe turn some of their lives

13    around.  I love you, buddy.  That's it.  Thank you.

14            THE COURT:  Mr. Harris, thank you.

15            MR. MACCOLL:  Your Honor, Miss Stanley wishes to

16    address the Court.

17            THE COURT:  If she'll step forward, please.

18    Ms. Stanley, if you'll please state your first and last name

19    and spell your last name for us.

20            MS. STANLEY:  Kelly Stanley, S-T-A-N-L-E-Y.

21            THE COURT:  Thank you, please go ahead.

22            MS. STANLEY:  So I'd like to better communicate with

23    you the significant changes that Jason has made in his

24    mentality recently.  He basically has transcended his

25    mentality and mind state that he had four years ago.
```

1    Pre-COVID he was so distant.  The world has changed so much.

2    So to see the world how it was before and now is insane, and

3    the way that he thought before to now has just as dramatically

4    changed.  He went through like a metamorphosis, if you will.

5         I've known him for nine years, and from when I first met

6    him to how he speaks today is impressive in the amount of

7    growth he has made.  Because he's not really in the

8    environment to grow, but he is in the environment -- an

9    environment to self-reflect and think.  And he finally started

10   to do that, because he has been incarcerated many times

11   before.  But now, I don't want to say it's working, but he has

12   grown.

13        He doesn't even identify with who he used to be.  He's

14   completely changed.  And it's amazing to listen to some of the

15   words he says and his ideas because to me it's just so

16   profound.  He's a really good person.  And I wish that you had

17   the chance to be able to speak with him, because you would

18   look at him on paper and you would look at him in person and

19   say, wow, I can't believe this is the same person.  It's very

20   contrasted.  And I think that's why it's really hard for the

21   people who are here for him today to see him in a light that's

22   only shining on a little bit of who he is, because he's so

23   much more than what he's being described to.

24        He has a lot of support now, and I don't think he ever

25   admitted he had that support.  And I think it's just

1    resonating with him because he was never able to admit -- he
2    was always able to be honest with people, but he would never
3    be able to be honest with himself with the growth he needed to
4    make and the changes he needed to make.  He was very
5    forthcoming with knowing that.  And today he wants to change,
6    and he has made the effort to change and has started to
7    change.  But healing is not linear, and he needs to heal and
8    he needs to accept and he's started that process in doing so.
9        And it's really hard to think that 120 months is what he
10   wants and is recommending because that's a decade.  I've known
11   him for nine years and that's longer than I've even known him.
12   And that's a significant amount of time and that's very
13   impactful.  And it's really devastating that that's what we're
14   hopeful for.  Because a lot of people love him and he does a
15   lot for a lot of people, especially the aging people in his
16   family.  And 10 years, I don't know who will be here at that
17   time.  And it's hard because all the kids in his life, in 10
18   years they're going to be grown and in college and away.  So
19   not only is the time spent away going to be impactful to the
20   younger children, it's going to be to the older members of his
21   family as well.  And I think that's going to be really hard.
22   And it's just difficult for everybody involved.
23       And I know it's difficult for the victims as well,
24   because this is their chance to have justice, but crimes like
25   this affect a multitude of people through ripples.  And it's

1   hard because in a sentence you don't learn your lesson on the

2   last day.  Some people don't learn their lesson at all and

3   they keep reoffending.  So even when he's released he could

4   have at any point in that time made that decision to solely

5   never do anything like this again.  And pretrial up to this

6   day, he's already come to that conclusion.  He has plans for a

7   future, which he's never spoken of before, aside from having

8   dogs, because he loves animals.  And I think it's because

9   animals are therapeutic, and that's the only way he sought

10  therapy in the past.  And I think that with his mental health

11  being addressed and really going to therapy he would just be

12  more refined and he could be healthy.  And I think that's what

13  he really needs.  That's all.

14          THE COURT:  Thank you, Miss Stanley.

15          MS. STANLEY:  Thank you.

16          MR. MACCOLL:  Your Honor, the -- the defendant would

17  like to address the Court, Your Honor, before you impose

18  sentence.

19          THE COURT:  All right.  Mr. Candelario, if you'll

20  stand, please, and pull that microphone close to you.  And I

21  want to formally advise you as a defendant who's about to be

22  sentenced, you have a constitutional right to speak to me at

23  this time but you're not required to speak.  It's only if you

24  wish to speak.  Stand, please.  Do you wish to speak?

25          THE DEFENDANT:  I do, Your Honor.

```
 1              THE COURT:  All right.  Please go ahead.  You don't
 2       need to bend down.  The microphone will pick up your voice
 3       even if you're standing, that's good.
 4              THE DEFENDANT:  First I would -- I'd like to
 5       apologize to the Court for wasting your -- taking this time,
 6       but truthfully my apology is more -- if I can address them,
 7       apologize to them.
 8              THE COURT:  You should speak to me only, please.
 9              THE DEFENDANT:  All right.  She made a statement
10       about like all the kids affected and them having -- using that
11       as an excuse.  That was compelling.  And I don't like to use
12       my childhood or anything for an excuse for what I did as an
13       adult, like mental issues.  Really totally take like -- we
14       make decisions as grownups, I'll take responsibility
15       completely.
16          Once again, I want to apologize for them for putting
17       them through that ordeal.  No one should experience that.
18       Putting myself in this situation, thinking about my family
19       going through that tragic incident, I could not imagine that.
20          For Mr. Harris to feel in any way that he has any part,
21       like he's played any role of me being in this situation now is
22       just -- I'm sorry for that as well.  He should never feel like
23       that.  That's just completely my decisions, bad decisions.
24          It's been a few years since -- since then and it's just
25       not -- I'm not the same, I'm not the same, you know, it's --
```

1  this is -- this is not a life which, you know, that I want to

2  follow.  I have a -- I have the potential to do and impact a

3  lot of people.  I have, I do.  I'm just asking that, you know,

4  I've got to do time, I understand that.  I believe I should,

5  you know, a significant amount of time.  People -- you know,

6  what I did, what she said she has to endure, what she's going

7  through, you know, I'm sorry -- I'm sorry for that.

8         Excuse me.  Yeah, I take full responsibility.  You'll

9  never see me again, Your Honor.  And I'm making strides, I'm

10  going to be -- I'm going to set the example.  Thank you.

11  Thank you for hearing me.

12             THE COURT:  Thank you, Mr. Candelario.

13             MR. MACCOLL:  Thank you, Your Honor.

14             THE COURT:  Heather, could I see you at sidebar,

15  please?

16         (The Court conferred with the probation officer.)

17             THE COURT:  And so, Mr. MacColl, I take it that the

18  defendant has completed his presentation; is that correct?

19             MR. MACCOLL:  Your Honor, I -- yes, I -- I -- the

20  Court asked earlier but there's another issue, and I had asked

21  in our submissions that restitution begin at the completion of

22  the sentence.  And my concern is that the BOP's system of

23  taking defendant's phone money is extraordinarily punitive.

24  It's small dollars compared to the amount of restitution

25  that's owed.  And we respectfully request that the order

1    require restitution upon release.

2        I will say, Mr. Candelario wants to make restitution.

3    He is an optimistic person; he believes he will.  But if he's

4    able to get some gifts from family members so he can make

5    phone calls from the prison and get some stuff at the

6    commissary, he'll lose that in the meantime, we think would be

7    a mistake.  Another defendant briefed the issue in more detail

8    than I did late last week but it's the same issue.  And that's

9    the request we respectfully make, Your Honor.  And with that

10   addition, yes, the defendant's presentation is complete, Your

11   Honor.  Thank you.

12           THE COURT:  Thank you.  Attorney Clark.

13           MR. CLARK:  Just briefly, Your Honor, we object to

14   that request.  I believe there is some concern the BOP's going

15   to change its program for financial responsibility for

16   incarcerated persons.  Those changes have not yet occurred.

17   We think it would be inappropriate and inconsistent with the

18   practice and pattern of this court with respect to making

19   restitution payable immediately.

20           THE COURT:  Thank you.

21   Counsel, I've also been informed by Probation Officer

22   Belanger that there's an additional condition of supervised

23   release that you've -- both sides have been informed of and

24   agree to.  That condition is the defendant shall not have any

25   contact, directly or indirectly, with R.S. or A.M., names in

1    full to be retained by the clerk's office.  Attorney Clark,

2    the Government supports that addition?

3              MR. CLARK:  Correct, Your Honor.

4              THE COURT:  Attorney MacColl?

5              MR. MACCOLL:  Yes, Your Honor, we consent to that

6    condition and support it.  Thank you, Judge.

7              THE COURT:  Thank you.  In preparation for today's

8    sentencing the -- both sides submitted various memoranda which

9    I have carefully considered.  Today the Court has admitted

10   numerous exhibits, copies of which were provided to me in

11   advance so I had the opportunity to review them carefully in

12   advance, those that I've accepted.  And of course I've studied

13   the revised presentence report as well.

14       I've already announced portions of the presentence

15   report that have been objected to and which I have agreed with

16   the requests made by counsel to strike from consideration.

17   Subject to the rulings I've made earlier today, I'm otherwise

18   accepting the revised presentence investigation report in its

19   entirety as my findings in support of the sentence that I'm

20   about to announce.

21       I've also, of course, listened carefully to the

22   arguments made by the attorneys, the statements made by

23   Mr. Harris and Miss Stanley, and in particular Mr.

24   Candelario's statements to me.

25       I want to begin by turning to the U.S. Sentencing

1    Commission guidelines.  I want to summarize the provisions

2    that apply to this case.  Mr. Candelario's total offense level

3    under the guidelines is 29; his criminal history category is

4    V.  That results in a guideline sentencing range of 140 to 175

5    months, one to three years of supervised release, fine range

6    of 30,000 to $250,000.  He's ineligible for probation under

7    the guidelines, and he's subject to three special assessments

8    of a hundred dollars.

9         Attorney Clark, any objection to the summary I've just

10   offered?

11             MR. CLARK:  No, Judge.

12             THE COURT:  Mr. MacColl?

13             MR. MACCOLL:  No, Your Honor, thank you.

14             THE COURT:  In addition to all that I've just

15   indicated I have considered as I prepared for sentencing today

16   and as I've participated in this hearing, the law also

17   requires that I consider a number of other factors which are

18   quite important in the manner in which I've evaluated the

19   information I've received.

20        In sentencing Mr. Candelario I am considering, among

21   other things, the nature and circumstances of the crime he

22   committed; his history and characteristics; the need for the

23   sentence to reflect the seriousness of the crime, promote

24   respect for the law, and provide just punishment for the

25   crime; the importance of protecting the public from further

1    crimes by Mr. Candelario; his need for educational or

2    vocational training, medical care, or other correctional

3    treatment in the most effective manner; and the need to avoid

4    unwarranted sentencing disparities.  I have weighed all those

5    factors.

6        Mr. Candelario has pled guilty to three charges.  Count

7    1, conspiracy to commit Hobbs Act robbery; Count 2,

8    interference with commerce by violence and aid and abetting;

9    and Count 5, felon in possession of a firearm.  I turn first

10    to the offense conduct.

11        In the summer of 2019 Mr. Candelario and certain

12    co-defendants met in New Hampshire and planned to rob an

13    individual who resides in York, Maine, to obtain marijuana and

14    marijuana proceeds.  This was to be a carefully planned and

15    orchestrated robbery.  He along with three individuals drove

16    to York in two vehicles, a car and a truck.  Mr. Candelario,

17    Mr. Carpio, and a third co-defendant were in the car, and they

18    drove to the driveway of the residence at night.

19        Mr. Candelario and Mr. Carpio, dressed in a manner to

20    hide their identities, hid in the woods.  Then when the

21    victims returned Mr. Candelario and Mr. Carpio confronted them

22    shortly after they had pulled into the garage and as the

23    gentleman who was driving the truck was exiting the vehicle.

24    Mr. Candelario and Mr. Carpio were armed; they had handguns.

25    They also had a backpack that contained duct tape, zip ties,

1    and empty garbage bags.  Now, perhaps it wasn't what they

2    anticipated, but the victim, the driver of the truck,

3    resisted, and there was a fight that ensued between him and

4    Mr. Candelario.  It's at that point that Mr. Carpio shot the

5    victim in the lower abdomen.  Mr. Candelario himself was

6    grazed by a bullet -- by the bullet.

7          Candelario and Carpio fled into the woods, abandoning

8    the robbery.  Later they rendezvoused with Mr. Soboleski and

9    drove back to Massachusetts.  I note that there's no

10   indication in the record before me that Mr. Candelario or his

11   accomplice made any effort to offer aid to the victim who had

12   been shot.  The victim underwent emergency surgery and he

13   survived.

14         The financial, physical, and emotional impact on both

15   victims and their families has been extreme, life altering,

16   and it continues.  Measured against the types of crimes that

17   we see typically in this courtroom, this of course is among

18   the most serious because of the potential, at least, for the

19   loss of life.

20         Now, Mr. Candelario is at this point in life 34 years of

21   age.  He has a substantial criminal record which began when he

22   was young.  He has four significant prior felony convictions,

23   two robberies, a burglary, and a breaking and entering.  His

24   conviction for a 2005 robbery in New Hampshire involved the

25   use of a handgun, as did his conviction for a 2007 robbery

1      also in New Hampshire.  His conviction for a 2014 burglary

2      also included the use of a firearm.  And of course this crime

3      involved a firearm and was committed while Mr. Candelario was

4      under a criminal justice sentence for a prior conviction.

5          His criminal history score under the guidelines is 9,

6      but because of the fact that it was committed while under a

7      criminal justice sentence two points are added, and that

8      brings it up to 11, and under the guidelines that results in a

9      criminal history category of V, the second-highest level.

10         The Government seeks an upward departure or variance,

11     arguing that Mr. Candelario's criminal history category does

12     not accurately reflect the seriousness of his past criminal

13     conduct and the likelihood that he will have to commit other

14     crimes.  I have weighed that request as I have listened to the

15     various arguments and statements that have been made in court

16     this morning.  I've also, of course, consulted the guidelines

17     generally with respect to the sentencing ranges that apply,

18     depending upon whether Category V or Category VI is employed.

19         For purposes of a request for a departure from the

20     guidelines, which the Government has made, I'm not persuaded

21     that Category V so understates the seriousness of his history

22     as to support a departure step up to Category VI, and

23     therefore I am not imposing an upward departure.  I will be

24     applying Category V, but I will account for the nature and

25     seriousness of the crimes that Mr. Candelario previously

1    committed and the light they shed on the risk that he will

2    recidivate in my evaluation of the Section 3553(a) sentencing

3    factors and whether there should be a variant sentence ordered

4    in this case.  And to be clear, I am not giving any

5    consideration to Mr. Candelario's arrests or offenses for

6    which he was charged that did not result in a conviction.

7         I have accepted Mr. Candelario's assertion that he did

8    not discharge his gun, nor did he try to break the truck's

9    window on the night in question.  But the fact remains that he

10   engaged in the planning and execution of this robbery at a

11   residence in which he was armed, equipped with duct tape and

12   zip ties, and was, as he admits, the intruder who wrestled an

13   innocent victim that led to the shooting of that victim and,

14   as I've already said, to severe injuries.  It is fortuitous

15   that the victim was not mortally wounded.

16        Mr. Candelario had a difficult childhood, really, more

17   accurately stated, an extremely difficult childhood that helps

18   to explain the path that he has led as an adult.  He was cared

19   for primarily as a child by his mother's cousin because his

20   mother was absent because she herself was incarcerated.  His

21   father was totally absent from his life.  As a child and then

22   adolescent he lacked for adult supervision.  Indeed, from the

23   record that's before me, it's fair to say he had almost no

24   supervision.  This is an extreme case.  And he became involved

25   with a gang at a very young age, entering state custody at age

1    13, where he remained throughout his adolescence.

2        He asserts and I accept that he was subject to myriad

3    forms of abuse at the youth center while held in state

4    custody.  There is no question that this is an individual who

5    experienced serious abuse and neglect as a child and

6    adolescent, and of course experiences such as that result in

7    trauma.  His early life experiences led him getting involved

8    with a gang as a young adolescent -- strike that.  I'm going

9    to disregard the information in the report regarding his gang

10   involvement.

11       I'll simply say that his early life experiences led him

12   into state custody, as I've said, at the age of 13.  Certainly

13   his life as a child, adolescent, and young adult helps to

14   explain his criminality as an adult and is properly weighed as

15   a potentially mitigating factor as I consider the Section

16   3553(a) sentencing factors.

17       The various friends, educators, and family members who

18   submitted letters on his behalf, and of course Mr. Harris and

19   Ms. Stanley today in person, point to the fact that Mr.

20   Candelario has positive qualities and potential.  I have no

21   doubt that that is true.  He is known to them as being an

22   intelligent, compassionate person, who at times in his life

23   has demonstrated a strong work ethic.  Also again I accept

24   that as true.

25       With respect to his health, there's nothing indicating

1    any serious physical health problems for someone his age.  He

2    asserts that he has a problem with marijuana use.  He reports

3    suffering from clinical depression, which of course is no

4    surprise given his history of abuse and neglect.  And I will

5    accept the defendant's request that I recommend participation

6    in the 500-hour RDAP program and mental health treatment while

7    in the Bureau of Prisons.  That makes complete sense.

8         Furthermore, since he has been incarcerated he has taken

9    some classes.  He has received various certifications in

10   vocational work, and I'd note that prior to his arrest he was

11   employed at a laborer's union working for various employers

12   and earning a positive letter of recommendation from the

13   individual who was responsible for supervising him.  Those

14   close to him see him as finally having taken a major stride

15   toward moving beyond what one of the letter writers

16   characterized to be, quote, an expired version of himself, end

17   of quote.  Time will tell if that's true.

18        Now, Counts 1 and 2 in this case carry with them maximum

19   terms of imprisonment of 20 years and Count 5 a maximum term

20   of imprisonment of 10 years.  The parties have stipulated in

21   this case that the penalties of the Armed Career Criminal Act

22   do not apply.

23        Mr. Candelario has accepted responsibility for his

24   crime.  He has done so by pleading guilty in this case.  He

25   expresses remorse, and I accept his expressions of remorse and

1       acceptance of responsibility as sincere.

2           Now, in weighing the 3553(a) factors that I noted

3       earlier, it's important to emphasize that Mr. Candelario's

4       successive criminal convictions did not deter him from again

5       committing serious criminal conduct.  Although I've concluded

6       that his Criminal History Category V does not support a

7       departure in this case, the fact remains that that history,

8       the history that includes the use of weapons, which occurred

9       again here, is very serious.

10          I find, considering Mr. Candelario's past and this

11      crime, that he does present a real potential for continued

12      recidivism and the sentence has to account for that.  Also, in

13      weighing the seriousness of the crime, in this instance a

14      planned, coordinated robbery at night in someone's home

15      resulting in serious physical and psychic harm to the victims,

16      seems to me that the sentence has to account for that level

17      of -- that degree of seriousness.

18          I've also carefully weighed, as I've described it, Mr.

19      Candelario's difficult childhood.  And I mentioned earlier,

20      it's fair to consider that in mitigation, and I do.  It is

21      what leads me to conclude not to impose a variant sentence in

22      excess of the guideline range, even though such a sentence

23      might be supported given the harm that occurred here, but also

24      I conclude that the serious harm committed here, Mr.

25      Candelario's criminal history, and what I see as a serious

1    risk of recidivism require a sentence at the top of the

2    guideline range.  This will account for the seriousness of the

3    crime, provide protection to the public from further crimes,

4    and cause Mr. Candelario to experience a lengthy period of

5    incarceration in which he can attempt to rehabilitate himself,

6    hopefully acquire skills, and we hope enter society after many

7    years an older, wiser, healthier person who's committed to

8    living a law-abiding and positive life.

9         In addition, it seems to me that a sentence at the high

10   end of the applicable guideline range is needed here to

11   provide both specific deterrence to Mr. Candelario as well as

12   to general deterrence to the public at large, which needs to

13   understand that the Court will impose lengthy sentences for

14   conduct this despicable.

15        Counsel, before I conclude the sentencing analysis and

16   announce sentence, is there any aspect of your argument,

17   Attorney Clark, I have not addressed that needs to be

18   addressed?

19             MR. CLARK:  No, Judge.

20             THE COURT:  Attorney MacColl?

21             MR. MACCOLL:  I don't think so, Your Honor, thank

22   you.

23             THE COURT:  Thank you.

24        Mr. Candelario, I'd ask that you stand, please.  The

25   sentence that I impose, Mr. Candelario -- that I'm about to

1    impose I believe is necessary to reflect the seriousness of

2    the offense, promote respect for the law, and provide just

3    punishment, also to afford adequate deterrence and to protect

4    the public from further crimes, and also to provide you with a

5    period of incarceration in which I hope you will receive the

6    training, medical care, and correctional treatment that you

7    need in the most effective manner.  Based upon all the

8    considerations that I've announced, I've concluded that a just

9    and fair sentence is as follows:

10         I'm committing you to the custody of the U.S. Bureau of

11   Prisons on Counts 1 and 2 for a total term of 175 months and

12   on Count 5 for 100 months, all concurrent.  I am recommending

13   to the Bureau of Prisons that you be considered for the

14   500-hour RDAP program and that you be considered for placement

15   at a facility that can offer you the mental health treatment

16   services that you need.  I'm remanding you to the custody of

17   the U.S. Marshal for the District of Maine at the conclusion

18   of the sentencing in furtherance of the sentence.

19         Upon your completion of your term of imprisonment, I'm

20   ordering that you be on supervision for three years, subject

21   to all the mandatory, standard, and special conditions of

22   supervision that were laid out in the revised presentence

23   investigation report, along with the additional condition that

24   I announced on the record earlier today.

25         Attorney MacColl, are there any objections to any of the

1      conditions that are set forth in the report and the additional

2      condition we've announced today?

3                MR. MACCOLL:  There are not, Your Honor.

4                THE COURT:  Mr. Candelario, you're familiar with all

5      these conditions?

6                THE DEFENDANT:  I am, Your Honor.

7                THE COURT:  Are you prepared to comply?

8                THE DEFENDANT:  Yes, Your Honor.

9                THE COURT:  Do you have any objection?

10               THE DEFENDANT:  I do not.

11               THE COURT:  I'm imposing three $100 special

12     assessments.  I'm not imposing a fine because I find that Mr.

13     Candelario does not have the means with which to pay a fine.

14     I am ordering that he pay restitution in the sum of

15     $180,277.06.  This is to be joint and several without

16     interest.  I am ordering that it be payable immediately.

17          I am certainly aware of the argument that has been made

18     regarding the potential for the Bureau of Prisons to change

19     its policies, but that has not happened.  And, in any event,

20     it seems to me that justice in this case certainly does -- is

21     better served by the victims receiving whatever restitution

22     they might receive immediately and not having to wait many

23     years before the onset of restitution.

24          I have carefully considered each of the defendant's

25     objections to the guidelines analysis as they would affect his

1    or her total offense level and criminal history category.

2    Even if I had accepted one or all of those objections, the

3    sentence I have announced today is untethered from the

4    guidelines.  I would impose the same sentence even if the

5    applicable sentencing guideline range would have been reduced

6    by any or all of the objections made by the defendant that I

7    did not accept.  The sentence I have imposed would be the same

8    strictly only considering the Section 3553(a) sentencing

9    factors.

10        Attorney Clark, please remind me, are there any counts

11   that need to be dismissed at this time?

12            MR. CLARK:  No, Your Honor.

13            THE COURT:  And, Attorney Clark, is there any aspect

14   of the sentence I have not addressed that needs to be

15   addressed?

16            MR. CLARK:  No, Your Honor.

17            THE COURT:  Attorney MacColl?

18            MR. MACCOLL:  There is not, Your Honor.  I recognize

19   that the Court has ruled and has carefully considered its

20   ruling and I'm not about to change its mind, but so that

21   there's not any argument of waiver we respectfully submit that

22   the sentence is procedurally and substantively unreasonable

23   as -- as too high.  The procedural objections, Your Honor,

24   relate to the inclusion in the presentence report of

25   descriptions of charged and dismissed conduct.  The Court has

1    indicated it didn't take those into account, I understand

2    that, I'm just preserving that objection, and to the

3    imposition of the 175 months, Your Honor.  I'll also preserve

4    the objection with respect to the restitution so that I can

5    discuss that with Mr. Candelario after today, Your Honor.

6    Thank you.

7              THE COURT:  Thank you.  Officer Belanger?

8              PROBATION OFFICER:  Excuse me, Judge, I just wanted

9    to clarify that the supervised release is imposed on each

10   count and concurrently?

11             THE COURT:  Correct.  Supervision is three years as

12   to each count concurrent.

13        Mr. Candelario, I want to advise you of your rights to

14   appeal.  You do have the right to appeal from your conviction

15   and sentence.  To exercise that right, you are required to

16   file a written notice of appeal with the clerk of court within

17   14 days of today.  Do you understand?

18             THE DEFENDANT:  I do, Your Honor.

19             THE COURT:  If you fail to do that, that is, file it

20   within 14 days, you'll have given up your right to appeal the

21   sentence and conviction.  Do you understand?

22             THE DEFENDANT:  I do, Your Honor.

23             THE COURT:  If you can't afford to file the appeal,

24   you can appeal without cost to you.  On your -- at your

25   request the clerk will prepare and file a notice of appeal

1    without charge.  This is upon your written request.  Again, it

2    has to be made within 14 days.  Do you understand?

3              THE DEFENDANT:  I do, Your Honor.

4              THE COURT:  Mr. Candelario, in a case such as this

5    where you're now facing a long prison sentence, and we have

6    victims who suffered great harm, especially in a case like

7    this, I hope that you understand that ultimately for justice

8    to be achieved you need to serve your time successfully, you

9    need to do everything you can to be ready to reenter society

10   and be the best person you're capable of being, and then go

11   ahead and live a life that you can be proud of.  That's

12   ultimately I think what is needed here, truly, for full

13   justice to be achieved.

14        This should not be for naught.  We've had -- there's

15   many people that stand where you're standing right now who I

16   sentence who have no one in the courtroom to support them, no

17   one comes, and you have a small community here.  And so in

18   that respect you're a fortunate man.  You have people that

19   care about you and see good things in you.  There's a reason

20   for that.  They apparently see potential in you.  And I hope

21   that you see that as well.  I would hope that it might provide

22   some sense of justice, additional sense of justice, for the

23   victims in this case if in fact you go forth in life and do

24   good things, don't harm anyone.  Make amends.  Every person is

25   capable of redemption ultimately.  But this is all in your

1    hands now.  This is up to you.  So I hope that you'll use

2    every day wisely and that you'll achieve that.

3         I want to thank Probation Officer Belanger in this case

4    for her assistance.  I want to thank the attorneys for all of

5    their hard efforts.

6         Counsel, anything else before we close the record?

7              MR. CLARK:  No, Judge.

8              MR. MACCOLL:  Not from the defense, thank you, Your

9    Honor.

10              THE COURT:  We stand adjourned.

11                   (Time noted:  11:17 a.m.)

12              **C E R T I F I C A T I O N**

13    I, Lori D. Dunbar, Registered Merit Reporter, Certified

14    Realtime Reporter, and Official Court Reporter for the United

15    States District Court, District of Maine, certify that the

16    foregoing is a correct transcript from the record of

17    proceedings in the above-entitled matter.

18    Dated:  June 16, 2023

19              /s/ Lori D. Dunbar

20              Official Court Reporter

21

22

23

24

25